*125 Justice Kennedy
announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II-A-1, and II-B-2, an opinion with respect to Parts II-A-2, II-B-1, II-B-3, and III-B, in which Justice Stevens and Justice Souter join, and an opinion with respect to Part III-A, in which Justice Stevens, Justice Souter, and Justice Thomas join.
This case presents the question whether Title III of the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 353, 42 U. S. C. § 12181 et seq., applies to foreign-flag cruise ships in United States waters. The Court of Appeals for the Fifth Circuit held Title III did not apply because of a presumption, which it sought to derive from this Court’s case law, that, absent a clear indication of congressional intent, general statutes do not apply to foreign-flag ships. 356 F. 3d 641, 644-646 (2004). The Court of Appeals for the Eleventh Circuit, on the other hand, has held that the ADA does apply to foreign-flag cruise ships in United States waters. See Stevens v. Premier Cruises, Inc., 215 F. 3d 1237 (2000). We granted certiorari to resolve the conflict. 542 U. S. 965 (2004).
Our cases hold that a clear statement of congressional intent is necessary before a general statutory requirement can interfere with matters that concern a foreign-flag vessel’s internal affairs and operations, as contrasted with statutory requirements that concern the security and well-being of United States citizens or territory. While the clear statement rule could limit Title Ill’s application to foreign-flag cruise ships in some instances, when it requires removal of physical barriers, it would appear the rule is inapplicable to many other duties Title III might impose. We therefore reverse the decision of the Court of Appeals for the Fifth Circuit that the ADA is altogether inapplicable to foreign vessels, and we remand for further proceedings.
*126 t — H
The respondent Norwegian Cruise Line Ltd. (NCL), a Bermuda corporation with a principal place of business in Miami, Florida, operates cruise ships that depart from, and return to, ports in the United States. The ships are essentially floating resorts. They provide passengers with staterooms or cabins, food, and entertainment. The cruise ships stop at different ports of call where passengers may disembark. Most of the passengers on these cruises are United States residents; under the terms and conditions of the tickets, disputes between passengers and NCL are to be governed by United States law; and NCL relies upon extensive advertising in the United States to promote its cruises and increase its revenues.
Despite the fact that the cruises are operated by a company based in the United States, serve predominantly United States residents, and are in most other respects United States-centered ventures, almost all of NCL’s cruise ships are registered in other countries, flying so-called flags of convenience. The two NCL cruise ships that are the subject of the present litigation, the Norwegian Sea and the Norwegian Star, are both registered in the Bahamas.
The petitioners are disabled individuals and their companions who purchased tickets in 1998 or 1999 for round-trip cruises on the Norwegian Sea or the Norwegian Star, with departures from Houston, Texas. Naming NCL as the defendant, the petitioners filed a class action in the United States District Court for the Southern District of Texas on behalf of all persons similarly situated. They sought declaratory and injunctive relief under Title III of the ADA, which prohibits discrimination on the basis of disability. The petitioners asserted that cruise ships are covered both by Title Ill’s prohibition on discrimination in places of “public accommodation,” § 12182(a), and by its prohibition on discrimination in “specified public transportation services,” § 12184(a). Both provisions require covered entities to make “reason *127 able modifications in policies, practices, or procedures” to accommodate disabled individuals, §§ 12182(b)(2)(A)(ii), 12184(b)(2)(A), and require removal of “architectural barriers, and communication barriers that are structural in nature,” where such removal is “readily achievable,” §§ 12182(b)(2)(A)(iv), 12184(b)(2)(C).
The District Court held that, as a general matter, Title III applies to foreign-flag cruise ships in United States territorial waters. Civ. Action No. H-00-2649 (SD Tex., Sept. 10, 2002), App. to Pet. for Cert. 35a. The District Court found, however, that the petitioners’ claims regarding physical barriers to access could not go forward because the agencies charged with promulgating architectural and structural guidelines for ADA compliance (the Architectural and Transportation Barriers Compliance Board, the Department of Transportation, and the Department of Justice) had not done so for cruise ships. In these circumstances, the court held, it is unclear what structural modifications NCL would need to make. Id., at 36a-42a. The District Court granted NCL’s motion to dismiss the barrier-removal claims, but denied NCL’s motion with respect to all the other claims. Id., at 47a.
The Court of Appeals for the Fifth Circuit affirmed in part and reversed in part. It reasoned that our cases, particularly Benz v. Compania Naviera Hidalgo, S. A., 353 U. S. 138 (1957), and McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U. S. 10 (1963), stand for the proposition that general statutes do not apply to foreign-flag vessels in United States territory absent a clear indication of congressional intent. 356 F. 3d, at 644 (“[T]o apply domestic law to foreign vessels entering United States waters, there must be present the affirmative intention of the Congress clearly expressed” (quoting Benz, supra, at 147; internal quotation marks omitted)); 356 F. 3d, at 646 {Benz and Mc-Culloch “prohibit United States courts from applying domestic statutes to foreign-flagged ships without specific evidence *128 of congressional intent”). As Title III does not contain a specific provision mandating its application to foreign-flag vessels, the Court of Appeals sustained the District Court’s dismissal of the petitioners’ barrier-removal claims on this alternative ground and reversed the District Court on the remaining Title III claims. 356 F. 3d, at 650-651.
The action was ordered dismissed for failure to state a claim, Fed. Rule Civ. Proc. 12(b)(6), before extensive discovery. We cannot then discuss the specific allegations in much detail but must confine our opinion to the relevant general principles. (On November 24,2004, the responsible agencies finally did issue draft guidelines for large passenger vessels and a Notice of Proposed Rulemaking. See 69 Fed. Reg. 69244, 69249. These developments are not dispositive of the legal question on which we granted certiorari, and we do not address how they might affect the ultimate resolution of the petitioners’ claims.)
II
A
1
Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations, 42 U. S. C. § 12182(a), and public transportation services, § 12184(a). The general prohibitions are supplemented by various, more specific requirements. Entities that provide public accommodations or public transportation: (1) may not impose “eligibility criteria” that tend to screen out disabled individuals, §§ 12182(b)(2)(A)(i), 12184(b)(1); (2) must make “reasonable modifications in policies, practices, or procedures, when such modifications are necessary” to provide disabled individuals full and equal enjoyment, §§ 12182(b)(2)(A)(ii), 12184(b)(2)(A); (3) must provide auxiliary aids and services to disabled individuals, §§ 12182(b)(2)(A)(iii), 12184(b)(2)(B); and (4) must remove architectural and structural barriers, or if barrier removal is *129 not readily achievable, must ensure equal access for the disabled through alternative methods, §§ 12182(b)(2)(A)(iv)-(v), 12184(b)(2)(C).
These specific requirements, in turn, are subject to important exceptions and limitations. Eligibility criteria that screen out disabled individuals are permitted when “necessary for the provision” of the services or facilities being offered, §§ 12182(b)(2)(A)(i), 12184(b)(1). Policies, practices, and procedures need not be modified, and auxiliary aids need not be provided, if doing so would “fundamentally alter” the services or accommodations being offered. §§ 12182(b)(2)(A)(ii) — (iii). Auxiliary aids are also unnecessary when they would “result in an undue burden,” § 12182(b)(2)(A)(iii). As we have noted, moreover, the barrier-removal and alternative access requirements do not apply when these requirements are not “readily achievable,” §§ 12182(b)(2)(A)(iv)-(v). Additionally, Title III does not impose nondiscrimination or accommodation requirements if, as a result, disabled individuals would pose “a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services,” § 12182(b)(3).
Although the statutory definitions of “public accommodation” and “specified public transportation” do not expressly mention cruise ships, there can be no serious doubt that the NCL cruise ships in question fall within both definitions under conventional principles of interpretation. §§ 12181(7)(AMB), (I), (L), 12181(10). The Court of Appeals for the Fifth Circuit, nevertheless, held that Title III does not apply to foreign-flag cruise ships in United States waters because the statute has no clear statement or explicit text mandating coverage for these ships. This Court’s cases, particularly Benz and McCulloch, do hold, in some circumstances, that a general statute will not apply to certain aspects of the internal operations of foreign vessels temporarily in United States waters, absent a clear statement. The *130 broad clear statement rule adopted by the Court of Appeals, however, would apply to every facet of the business and operations of foreign-flag ships. That formulation is inconsistent with the Court’s case law and with sound principles of statutory interpretation.
2
This Court has long held that general statutes are presumed to apply to conduct that takes place aboard a foreign-flag vessel in United States territory if the interests of the United States or its citizens, rather than interests internal to the ship, are at stake. See Cunard S. S. Co. v. Mellon, 262 U. S. 100, 127 (1923) (holding that the general terms of the National Prohibition Act apply to foreign-flag ships in United States waters because “[tjhere is in the act no provision making it [inapplicable” to such ships); Uravic v. F. Jarka Co., 282 U. S. 234, 240 (1931) (holding that “general words” should be “generally applied” and that therefore there is “no reason for limiting the liability for torts committed [aboard foreign-flag ships in United States territory] when they go beyond the scope of discipline and private matters that do not interest the territorial power”). The general rule that United States statutes apply to foreign-flag ships in United States territory is subject only to a narrow exception. Absent a clear statement of congressional intent, general statutes may not apply to foreign-flag vessels insofar as they regulate matters that involve only the internal order and discipline of the vessel, rather than the peace of the port. This qualification derives from the understanding that, as a matter of international comity, “all matters of discipline and all things done on board which affec[t] only the vessel or those belonging to her, and [do] not involve the peace or dignity of the country, or the tranquility of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged.” Wildenhus’s Case, 120 U. S. 1, 12 (1887). This exception to the usual presumption, however, does not extend beyond *131 matters of internal order and discipline. “[I]f crimes are committed on board [a foreign-flag vessel] of a character to disturb the peace and tranquility of the country to which the vessel has been brought, the offenders have never by comity or usage been entitled to any exemption from the operation of the local laws.” Ibid.
The two cases in recent times in which the presumption against applying general statutes to foreign vessels’ internal affairs has been invoked, Benz and McCulloch, concern labor relations. The Court held that the general terms of the National Labor Relations Act (NLRA), 49 Stat. 449, 29 U. S. C. § 151 et seq., did not govern the respective rights and duties of a foreign ship and its crew because the NLRA standards would interfere with the foreign vessel’s internal affairs in those circumstances. These cases recognized a narrow rule, applicable only to statutory duties that implicate the internal order of the foreign vessel rather than the welfare of American citizens. McCulloch, 372 U. S., at 21 (holding that “the law of the flag state ordinarily governs the internal affairs of a ship” (emphasis added)); see also Benz, 353 U. S., at 146-147. The Court held the NLRA inapplicable to labor relations between a foreign vessel and its foreign crew not because foreign ships are generally exempt from the NLRA, but because the particular application of the NLRA would interfere with matters that concern only the internal operations of the ship. In contrast, the Court held that the NLRA is fully applicable to labor relations between a foreign vessel and American longshoremen because this relationship, unlike the one between a vessel and its own crew, does not implicate a foreign ship’s internal order and discipline. Longshoremen v. Ariadne Shipping Co., 397 U. S. 195, 198-201 (1970).
This narrow clear statement rule is supported by sound principles of statutory construction. It is reasonable to presume Congress intends no interference with matters that are primarily of concern only to the ship and the foreign state *132 in which it is registered. It is also reasonable, however, to presume Congress does intend its statutes to apply to entities in United States territory that serve, employ, or otherwise affect American citizens, or that affect the peace and tranquility of the United States, even if those entities happen to be foreign-flag ships.
Cruise ships flying foreign flags of convenience offer public accommodations and transportation services to over 7 million United States residents annually, departing from and returning to ports located in the United States. Large numbers of disabled individuals, many'of whom have mobility impairments that make other kinds of vacation travel difficult, take advantage of these cruises or would like to do so. To hold there is no Title III protection for disabled persons who seek to use the amenities of foreign cruise ships would be a harsh and unexpected interpretation of a statute designed to provide broad protection for the disabled. § 12101. The clear statement rule adopted by the Court of Appeals for the Fifth Circuit, moreover, would imply that other general federal statutes — including, for example, Title II of the Civil Rights Act of 1964, 78 Stat. 243, 42 U. S. C. § 2000a et seq. — would not apply aboard foreign cruise ships in United States waters. A clear statement rule with this sweeping application is unlikely to reflect congressional intent.
The relevant category for which the Court demands a clear congressional statement, then, consists not of all applications of a statute to foreign-flag vessels but only those applications that would interfere with the foreign vessel’s internal affairs. This proposition does not mean the clear statement rule is irrelevant to the ADA, however. If Title III by its terms does impose duties that interfere with a foreign-flag cruise ship’s internal affairs, the lack of a clear congressional statement can mean that those specific applications of Title III are precluded. On remand, the Court of Appeals may need to consider which, if any, Title III requirements interfere *133 with the internal affairs of foreign-flag vessels. As we will discuss further, however, Title Ill’s own limitations and qualifications may make this inquiry unnecessary.
B
1
The precise content of the category “internal affairs” (or, as it is variously denoted in the case law, “internal order” or “internal operations”) is difficult to define with precision. There is, moreover, some ambiguity in our cases as to whether the relevant category of activities is restricted to matters that affect only the internal order of the ship when there is no effect on United States interests, or whether the clear statement rule further comes into play if the predominant effect of a statutory requirement is on a foreign ship’s internal affairs but the requirement also promotes the welfare of United States residents or territory. We need not attempt to define the relevant protected category with precision. It suffices to observe that the guiding principles in determining whether the clear statement rule is triggered are the desire for international comity and the presumed lack of interest by the territorial sovereign in matters that bear no substantial relation to the peace and tranquility of the port.
It is plain that Title III might impose any number of duties on cruise ships that have nothing to do with a ship’s internal affairs. The pleadings and briefs in this case illustrate, but do not exhaust, the ways a cruise ship might offend such a duty. The petitioners allege NCL charged disabled passengers higher fares and required disabled passengers to pay special surcharges, Plaintiffs’ First Amended Original Complaint in No. H-00-2649 (SD Tex.), ¶ 32, App. 15 (hereinafter Complaint); Brief for Petitioners 17-20; maintained evacuation programs and equipment in locations not accessible to disabled individuals, Complaint ¶ 19, App. 12; Brief for Petitioners 21; required disabled individuals, but *134 not other passengers, to waive any potential medical liability and to travel with a companion, id., at 8,17-18; and reserved the right to remove from the ship any disabled individual whose presence endangers the “comfort” of other passengers, id., at 8,20. The petitioners also allege more generally that NCL “failed to make reasonable modifications in policies, practices, and procedures” necessary to ensure the petitioners’ full enjoyment of the services NCL offered. Complaint ¶ 80, App. 15. These are bare allegations, and their truth is not conceded. We express no opinion on the factual support for those claims. We can say, however, that none of these alleged Title III violations implicate any requirement that would interfere with the internal affairs and management of a vessel as our cases have employed that term.
At least one subset of the petitioners’ allegations, however, would appear to involve requirements that might be construed as relating to the internal affairs of foreign-flag cruise ships. These allegations concern physical barriers to access on board. For example, according to the petitioners, most of the cabins on NCL’s cruise ships, including the most attractive cabins in the most desirable locations, are not accessible to disabled passengers. Brief for Petitioners 17-18; Complaint ¶ 16, App. 11. The petitioners also allege that the ships’ coamings — the raised edges around their doors— make many areas of the ships inaccessible to mobility-impaired passengers who use wheelchairs or scooters. Brief for Petitioners 24. Removal of these and other access barriers, the petitioners suggest, may be required by Title Ill’s structural barrier-removal requirement, §§ 12182(b)(2) (A)(iv), 12184(b)(2)(C).
Although these physical barriers affect the passengers as well as the ship and its crew, the statutory requirement could mandate a permanent and significant alteration of a physical feature of the ship — that is, an element of basic ship design *135 and construction. If so, these applications of the barrier-removal requirement likely would interfere with the internal affairs of foreign ships. A permanent and significant modification to a ship’s physical structure goes to fundamental issues of ship design and construction, and it might be impossible for a ship to comply with all the requirements different jurisdictions might impose. The clear statement rule would most likely come into play if Title III were read to require permanent and significant structural modifications to foreign vessels. It is quite a different question, however, whether Title III would require this. The Title III requirements that might impose permanent and substantial changes to a ship’s architecture and design, are, like all of Title Ill’s requirements, subject to the statute’s own specific limitations and qualifications. These limitations may make resort to the clear statement rule unnecessary.
2
Title III requires barrier removal if it is “readily achievable,” § 12182(b)(2)(A)(iv). The statute defines that term as “easily accomplishable and able to be carried out without much difficulty or expense,” § 12181(9). Title III does not define “difficulty” in § 12181(9), but use of the disjunctive— “easily accomplishable and able to be carried out without much difficulty or expense” — indicates that it extends to considerations in addition to cost. Furthermore, Title III directs that the “readily achievable” determination take into account “the impact. . . upon the operation of the facility,” § 12181(9)(B).
Surely a barrier-removal requirement under Title III that would bring a vessel into noncompliance with the International Convention for the Safety of Life at Sea (SOLAS), Nov. 1,1974, [1979-1980] 32 U. S. T. 47, T. I. A. S. No. 9700, or any other international legal obligation, would create serious difficulties for the vessel and would have a substantial im *136 pact on its operation, and thus would not be “readily achievable.” This understanding of the statute, urged by the United States, is eminently reasonable. Brief as Amicus Curiae 27-28; ADA Title III Technical Assistance Manual III-1.2000(D) (Supp. 1994), available at http://www.usdoj. gov/crt/ada/taman3up.html (as visited May 31, 2005, and available in Clerk of Court’s case file); 56 Fed. Reg. 45600 (1991). If, moreover, Title Ill’s “readily achievable” exemption were not to take conflicts with international law into account, it. would lead to the anomalous result that American cruise ships are obligated to comply with Title III even if doing so brings them into noncompliance with SOLAS, whereas foreign ships — which unlike American ships have the benefit of the internal affairs clear statement rule— would not be so obligated. Congress could not have intended this result.
It is logical and proper to conclude, moreover, that whether a barrier modification is “readily achievable” under Title III must take into consideration the modification’s effect on shipboard safety. A separate provision of Title III mandates that the statute’s nondiscrimination and accommodation requirements do not apply if disabled individuals would pose “a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services,” § 12182(b)(3). This reference is to a safety threat posed by a disabled individual, whereas here the question would be whether the structural modification itself may pose the safety threat. It would be incongruous, nevertheless, to attribute to Congress an intent to require modifications that threaten safety to others simply because the threat comes not from the disabled person but from the accommodation itself. The anomaly is avoided by concluding that a structural modification is not readily achievable within the meaning of § 12181(9) if it would pose a direct threat to the health or safety of others.
*137 3
Because Title III does not require structural modifications that would conflict with international legal obligations or pose any real threat to the safety of the crew or other passengers, it may well follow — though we do not decide the question here — that Title III does not require any permanent and significant structural modifications that interfere with the internal affairs of any cruise ship, foreign flag or domestic. If that is indeed the case, recourse to the clear statement rule would not be necessary.
Cases may arise, however, where it is prudent for a court to turn first to the internal affairs clear statement rule rather than deciding the precise scope and operation of the statute. Suppose, for example, it is a difficult question whether a particular Title III barrier-removal requirement is readily achievable, but the requirement does entail a permanent and significant structural modification, interfering with a foreign ship’s internal affairs. In that case a court sensibly could invoke the clear statement rule without determining whether Title III actually imposes the requirement. On the other hand, there may be many cases where it is not obvious that a particular physical modification relates to a vessel’s basic architecture and construction, but it is clear the modification would conflict with SOLAS or some other international legal obligation. In those cases, a court may deem it appropriate to hold that the physical barrier modification in question is . not readily achievable, without resort to the clear statement rule.
J-H H — 1 HH
A
In light of the preceding analysis, it is likely that under a proper interpretation of “readily achievable” Title III would impose no requirements that interfere with the internal affairs of foreign-flag cruise ships. If Title III did impose a duty that required cruise ships to make permanent and sig *138 nificant structural modifications that did not conflict with international law or threaten safety, or if the statute otherwise interfered with a foreign ship’s internal affairs, the clear statement rule recognized in Benz and McCulloch would come into play at that point. The Title III requirement in question, however, would still apply to domestic cruise ships, and Title III requirements having nothing to do with internal affairs would continue to apply to domestic and foreign ships alike.
This application-by-application use of the internal affairs clear statement rule is consistent with how the rule has traditionally operated. In Benz and McCulloch, the Court concluded that the NLRA did not apply to labor relations between a foreign-flag ship and its foreign crew because of interference with the foreign ships’ internal affairs. In Ariadne Shipping, however, the Court held that the NLRA does apply to labor relations between a foreign-flag ship and American longshoremen. Ariadne Shipping acknowledged the clear statement rule invoked in Benz and McCulloch but held that the “considerations that informed the Court’s construction of the statute in [those cases] are clearly inapplicable” to the question whether the statute applies to foreign ships’ labor relations with American longshoremen. 397 U. S., at 199. Ariadne Shipping held that the longshoremen’s “short-term, irregular and casual connection with the [foreign] vessels plainly belied any involvement on their part with the ships’ ‘internal discipline and order.’” Id., at 200. Therefore, application of the NLRA to foreign ships’ relations with American longshoremen “would have threatened no interference in the internal affairs of foreign-flag ships.” Ibid. If the clear statement rule restricts some applications of the NLRA to foreign ships (e. g., labor relations with the foreign. crew), but not others (e. g., labor relations with American longshoremen), it follows that the case-by-case application is also required under Title III of the ADA. The rule, where it is even necessary to invoke it, would restrict *139 some applications of Title III to foreign ships (e. g., certain structural barrier-modification requirements), but not others (e. g., the prohibition on discriminatory ticket pricing).
The internal affairs clear statement rule is an implied limitation on otherwise unambiguous general terms of the statute. It operates much like the principle that general statutes are construed not to apply extraterritorially, EEOC v. Arabian American Oil Co., 499 U. S. 244, 260 (1991), or the rule that general statutes are presumed not to impose monetary liability on nonconsenting States, Atascadero State Hospital v. Scanlon, 473 U. S. 234 (1985). Implied limitation rules avoid applications of otherwise unambiguous statutes that would intrude on sensitive domains in a way that Congress is unlikely to have intended had it considered the matter. In these instances, the absence of a clear congressional statement is, in effect, equivalent to a statutory qualification saying, for example, “Notwithstanding any general language of this statute, this statute shall not apply extraterritorially”; or “ . . . this statute shall not abrogate the sovereign immunity of nonconsenting States”; or “... this statute does not regulate the internal affairs of foreign-flag vessels.” These clear statement rules ensure Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation. An all-or-nothing approach, under which a statute is altogether inapplicable if but one of its specific applications trenches on the domain protected by a clear statement rule, would convert the clear statement rule from a principle of interpretive caution into a trap for an unwary Congress. If Congress passes broad legislation that has some applications that implicate a clear statement rule — say, some extraterritorial applications, or some applications that would regulate foreign ships’ internal affairs — an all-or-nothing approach would require that the entire statute, or some arbitrary set of applications larger than the domain protected by the clear statement rule, would be nullified. We decline to adopt that posture.
*140 B
Our holding that the clear statement rule operates only when a ship’s internal affairs are affected does not implicate our holding in Clark v. Martinez, 543 U. S. 371 (2005). Martinez held that statutory language given a limiting construction in one context must be interpreted consistently in other contexts, “even though other of the statute’s applications, standing alone, would not support the same limitation.” Id., at 380. This was simply a rule of consistent interpretation of the statutory words, with no bearing on the implementation of a clear statement rule addressed to particular statutory applications.
The statute in Martinez, 8 U. S. C. § 1231(a)(6), authorized detention of aliens pending their removal. In Zadvydas v. Davis, 533 U. S. 678, 696-699 (2001), the Court had interpreted this statute to impose time limits on detention of aliens held for certain reasons stated in the statute. The Court held that an alternative interpretation, one allowing indefinite detention of lawfully admitted aliens, would raise grave constitutional doubts. Having determined the meaning of § 1231(a)(6)’s text in Zadvydas, we were obliged in Martinez to follow the same interpretation even in a context where the constitutional concerns were not present. Martinez, 543 U. S., at 377-381. As already made clear, the question was one of textual interpretation, not the scope of some implied exception. The constitutional avoidance canon simply informed the choice among plausible readings of § 1231(a)(6)’s text: “The canon of constitutional avoidance,” Martinez explained, “comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them.” Id., at 385 (emphasis deleted).
Martinez gives full respect to the distinction between rules for resolving textual ambiguity and implied limitations on otherwise unambiguous text. Indeed, Martinez relies on *141 the distinction to reconcile its holding with two cases which did involve a clear statement rule, Raygor v. Regents of Univ. of Minn., 534 U. S. 533 (2002), and Jinks v. Richland County, 538 U. S. 456 (2003). Raygor had held that the tolling provision in the supplemental jurisdiction statute, 28 U. S. C. § 1367(d), does not apply to nonconsenting States because the statute lacks the required clear statement that States are within its coverage. Later, in Jinks, we held that the § 1367(d) tolling provision does apply to suits against counties. The counties were not protected by a clear statement rule analogous to the one applicable to States. See Martinez, 543 U. S., at 383, and n. 6; see also id., at 393-394 (Thomas, J., dissenting). “This progression of decisions,” we held in Martinez, “does not remotely establish that § 1367(d) has two different meanings, equivalent to the unlimited-detention/limited-detention meanings of § 1231(a)(6) urged upon us here. They hold that the single and unchanging disposition of § 1367(d)... does not apply to claims against States that have not consented to be sued in federal court.” Id., at 383. The distinction between Zadvydas and Martinez, on the one hand, and Raygor and Jinks, on the other, is the distinction between a canon for choosing among plausible meanings of an ambiguous statute and a clear statement rule that implies a special substantive limit on the application of an otherwise unambiguous mandate.
The internal affairs clear statement rule is an implied limitation rule, not a principle for resolving textual ambiguity. Our cases, then, do not compel or permit the conclusion that if any one application of Title III might interfere with a foreign-flag ship’s internal affairs, Title III is inapplicable to foreign ships in every other instance.
* * *
The Court of Appeals for the Fifth Circuit held that general statutes do not apply to foreign-flag ships in United *142 States waters. This Court’s cases, however, stand only for the proposition that general statutes are presumed not to impose requirements that would interfere with the internal affairs of foreign-flag vessels. Except insofar as Title III regulates a vessel’s internal affairs — a category that is not always well defined and that may require further judicial elaboration — the statute is applicable to foreign ships in United States waters to the same extent that it is applicable to American ships in those waters.
Title Ill’s own limitations and qualifications prevent the statute from imposing requirements that would conflict with international obligations or threaten shipboard safety. These limitations and qualifications, though framed in general terms, employ a conventional vocabulary for instructing courts in the interpretation and application of the statute. If, on remand, it becomes clear that even after these limitations are taken into account Title III nonetheless imposes certain requirements that would interfere with the internal affairs of foreign ships — perhaps, for example, by requiring permanent and substantial structural modifications — the clear statement rule would come into play. It is also open to the court on remand to consider application of the clear statement rule at the outset if, as a prudential matter, that appears to be the more appropriate course.
We reverse the judgment of the Court of Appeals and remand the case for further proceedings.

It is so ordered.