Reyna, Circuit Judge, concurring.
I join the majority and agree that Rule 4(k)(2) supports finding that the district court can exercise specific personal jurisdiction over Dynamic Air Ltda. ("DAL") in this case. Fed. R. Civ. P. 4(k)(2). I also agree that DAL has waived the issue of whether U.S. patent laws extend to U.S.-flagged ships on the high seas, but find that the broader issue of territoriality still weighs heavily in this case. I write to provide additional reasoning why the exercise of personal jurisdiction here does not offend traditional notions of fair play and substantial justice. See Burger King Corp. v. Rudzewicz , 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).
"The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders ." Asahi Metal Ind. Co. , v. Superior Court of Cal., Solano Cty. , 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (emphasis added). This emphasis on "national borders" is central to Rule 4(k)(2)(B) considerations. For example, prong three of the Rule 4(k)(2)(B) inquiry (i.e., the requirement that assertion of personal jurisdiction must comport with due process) requires the court to consider five factors: (1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive social policies. Burger King , 471 U.S. at 477, 105 S.Ct. 2174. Each of these factors raises the issue of the relationship between territoriality and U.S. patent law. The majority opinion also emphasizes the interest of the United States in enforcing its patent laws within its territories, an assertion that, in particular, implicates the territoriality issue. See Maj. Op. at 1002.
U.S. PATENT LAW ON THE HIGH SEAS
The crux of DAL's position that U.S. patent laws do not extend to U.S.-flagged *1004 ships in international waters rests on the notion that "the law of the flag doctrine 'is a figure of speech, a metaphor,' " and therefore a merchant ship is not part of the territory of the country whose flag she flies.[1] Appellee's Br. 52 (quoting Cunard S.S. Co. v.Mellon , 262 U.S. 100, 123, 43 S.Ct. 504, 67 L.Ed. 894 (1923) ). DAL thus seeks a categorical rule that because general statutes do not normally apply extraterritorially, U.S. patent laws can never apply to U.S.-flagged ships in international waters. I disagree with DAL's all-or-nothing argument.
There is no dispute that a ship's flag does not transform a ship into terra firma of the country whose flag she flies. That this "floating island" metaphor was once used does not displace the law of the flag's well-settled role in determining what nation's law applies to disputes aboard a ship. See William Tetley, Q.C., The Law of the Flag, "Flag Shopping," and Choice of Law , 17 Tul. Mar. L.J. 139, 140-47 (1993). Accordingly, the Supreme Court has recognized that the "well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship." McCulloch v. Sociedad Nacional de Marineros de Honduras , 372 U.S. 10, 21, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963) ; see Hellenic Lines Ltd. v. Rhoditis , 398 U.S. 306, 312, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970) (recognizing the "well-settled principle that the law of the country whose flag a ship flies governs shipboard transactions, absent some 'clear expression' from Congress to the contrary"). This sentiment is echoed by the Restatement (Third) of Foreign Relations Law § 502(2) (Am. Law Inst. 1987), which provides that "[t]he flag state may exercise jurisdiction to prescribe, to adjudicate, and to enforce, with respect to the ship or any conduct that takes place on the ship." The law of the flag also holds a long-standing role in determining the jurisdiction of disputes on the high seas. See Patent Boundaries , 87 Temp. L. Rev. at 522 ("The law of the flag does protect United States-flagged ships, which have long represented an extension of the sovereignty of the United States to the high seas."); see also Cunard , 262 U.S. at 123, 43 S.Ct. 504 (stating that the law of the flag is "chiefly applicable to ships on the high seas, where there is no territorial sovereign ..."); United States v. Sanford Ltd. , 880 F.Supp.2d 9, 16 (D.D.C. 2012) (recognizing that the law of the flag serves "as a tiebreaker of sorts for areas of the world (e.g., the high seas) where there is no territorial sovereign").
In the seminal maritime case Lauritzen v. Larsen , the Supreme Court identified the law of the flag as one of seven factors for a court to consider in choosing which law governs aboard a ship, stating:
This Court has said that the law of the flag supersedes the territorial principle, even for purposes of criminal jurisdiction of personnel of a merchant ship, because it "is deemed to be a part of the territory of that sovereignty (whose flag *1005 it flies), and not to lose that character when in navigable waters within the territorial limits of another sovereignty." On this principle, we concede a territorial government involved only concurrent jurisdiction of offenses aboard our ships. Some authorities reject, as a rather mischievous fiction, the doctrine that a ship is constructively a floating part of the flagstate, but apply the law of the flag on the pragmatic basis that there must be some law on shipboard, and it cannot change at every change of waters, and no experience shows a better rule than that of the state that owns her.
345 U.S. 571, 585, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) (citation omitted). The dispute in Lauritzen involved a suit for a Danish seaman's negligent injuries against a Danish owner of a Danish vessel anchored in Cuban waters off Havana, Cuba. Id. at 573, 73 S.Ct. 921. Despite the fact that the injuries occurred in Cuban waters, the Court found Danish law applied chiefly based on the law of the flag, stating the doctrine has "such weight," that "it must prevail unless some heavy counter-weight appears." Id. at 586, 73 S.Ct. 921. In addition to the law of the flag, the Lauritzen Court identified six other factors for a court to consider in determining what law applies aboard a ship: (1) place of the wrongful act; (2) allegiance or domicile of the injured; (3) allegiance of the ship owner; (4) place of contract; (5) inaccessibility of foreign forum; and (6) the law of the forum. Id . at 583-91, 73 S.Ct. 921. Lauritzen calls for a case-by-case, not a categorical, approach, to the question at hand-here, whether the specific U.S.-registered and flagged ships at issue, the HOS Pinnacle and HOS Resolution , are U.S. territory for purposes of the Patent Act.
International and maritime law also provide support for using the law of the flag as a dispositive factor in deciding whether a ship constitutes "territory" for purposes of jurisdiction. While the United States is not a party to the United Nations Convention on the Law of the Sea, the document is nevertheless informative. Article 92 provides that "[s]hips shall sail under the flag of one State only and save, in exceptional cases expressly provided for in international treaties or in this Convention, shall be subject to its exclusive jurisdiction on the high seas." Dec. 10, 1982, 1833 U.N.T.S. 397, 433 (emphasis added). In that same current, U.S. vessel registration requirements to obtain that flag amplify the law of the flag's importance in determining a merchant ship's nationality. See Lauritzen , 345 U.S. at 584, 73 S.Ct. 921 ("Each state under international law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it. Nationality is evidenced to the world by the ship's papers and its flag."). The United States has the most stringent registration requirements in the world. See H. Edwin Anderson, III, The Nationality of Ships and Flags of Convenience: Economics, Politics, and Alternatives , 21 Tul. Mar. L.J. 139, 151-52 (1996). For example, on a U.S.-flagged ship, only an American citizen may serve as captain, chief engineer, radio officer, deck watch officer and engineering officer. Id. In addition, only twenty-five percent of the unlicensed crew may be foreign. Id. To that effect, U.S. Coast Guard regulations provide that a Certificate of Documentation for a ship "serves as evidence of a vessel['s] nationality." 46 C.F.R. § 67.1. And a Certificate of Documentation for a vessel may only be issued to vessels "which are wholly owned by United States citizens." Id. § 67.30. Thus, a ship's flag and corresponding registration requirements are critical when assessing what nation's law applies to conduct, or a dispute, on a ship.
*1006 Turning to the Patent Act itself, 35 U.S.C. § 154(a) defines a patent owner's right to "exclude others from making, using, offering for sale, or selling the invention throughout the United States, or importing the invention into the United States ...." Section 100(c) defines the "United States" to mean "the United States of America, its territories and possessions." Prior to the enactment of the 1952 Act, the only authority speaking on whether U.S. patent laws apply to U.S-flagged ships on the high seas was Gardiner v. Howe , an 1865 case from then-existing Circuit Court of the District of Massachusetts. 9 F. Cas. 1157 (C.C.D. Mass. 1865). In Gardiner , the asserted patent claimed an improvement in the sails of vessels. Id. at 1157. The accused infringer allegedly used the improvement on the sails of his U.S.-flagged vessel while on the high seas and argued at trial that he could not be held liable for infringement because U.S. patent laws did not apply on the high seas. Id. The court disagreed, stating that the U.S. patent laws "extend[ ] to the decks of American vessels on the high seas, as much as it does to all the territory of the country, and for many purposes is even more exclusive." Id. at 1158. The court reasoned that any contrary ruling would render valueless "patents for improvements in the tackle and machinery of vessels, or in their construction ...." Id . Our predecessor court recognized the vitality of Gardiner in Marconi Wireless Telegraph Co. of America v. United States , when it held that U.S. patent laws extend to infringing acts at the American Legation at Peking in China. 99 Ct. Cl. 1, 67-68 (1942).
Nothing in the legislative history of the 1952 Patent Act evidences congressional intent to narrow the territorial scope of the patent laws from that articulated in Gardiner . See S. Rep. 101-266 (1990), as reprinted in 1990 U.S.C.C.A.N. 4058, 4060 (noting that the language of § 100(c) was "intended to be descriptive rather than limiting"). Rather, the sole justification given for including § 100(c) was "to avoid the use of long expressions in various parts of the revised title." S. Rep. 82-1979 (1952), as reprinted in 1952 U.S.C.C.A.N. 2394, 2409. To that point, when Congress considered the 1952 Act, Senator Pat McCarran explained that the legislation was not intended to change existing law in any way, but to "codif[y] the present patent laws." 98 Cong. Rec. 9323 (daily ed. July 4, 1952). Absent evidence that Congress intended the 1952 Act to alter the territorial reach of the U.S. patent laws, Gardiner remains persuasive. Midlantic Nat. Bank v. N.J. Dep't of Environ. Prot. , 474 U.S. 494, 501, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific."); Shaw v. Railroad Co. , 101 U.S. 557, 565, 25 L.Ed. 892 (1879) (similar).
In 1990, Congress applied the logic expressed by the Gardiner court in drafting legislation to extend U.S. patent law to U.S. spaceships. 1990 U.S.C.C.A.N. 4058, 4060-62. Specifically, in passing the Inventions in Outer Space Act, Congress recognized that absent language extending U.S. patent laws to U.S. spaceships, patent owners would be "unable to enjoin or collect damages for infringing activities in outer space," which "may chill prospects for commercial investment in outer space research and manufacturing." Id. at 4062. Section 105 of Title 35 thus provides that "[a]ny invention made, used or sold in outer space on a space object or component thereof under the jurisdiction or control of the United States shall be considered to be made, used or sold within the United States for the purposes of this title *1007 ...." Congress's logic in extending U.S. patent laws to U.S.-spaceships in outer space lends strong support for finding U.S. patent laws extend to U.S.-flagged ship on the high seas.
DAL may view that any holding on this issue is compelled by the traditional understanding that U.S. patent laws do not apply to foreign activities. See Microsoft Corp. v. AT&T Corp. , 550 U.S. 437, 454-55, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007). But DAL would be missing an important waypoint in that, given that the nationality of a U.S. flagship is "American," it would be incorrect to say that the activities upon her deck are foreign. Even so, the Supreme Court has warned against adopting categorical holdings based on general guiding principles. In Spector v. Norwegian Cruise Line Ltd. , the U.S. Court of Appeals for the Fifth Circuit categorically held that Title III of the Americans with Disabilities Act of 1990 ("ADA") does not apply to foreign vessels in U.S. ports based on the principle that a general statute does not apply to the internal operations of a foreign vessels in U.S. waters absent clear congressional intent. 545 U.S. 119, 127, 125 S.Ct. 2169, 162 L.Ed.2d 97 (2005) (plurality opinion). Even though Title III does not contain any provision expressly permitting its application to foreign-flag vessels, the Supreme Court reversed. Id. at 127-28, 125 S.Ct. 2169. It reasoned that, if applied in a sweeping manner to the whole of Title III, the principle that general statutes do not apply to the internal affairs of foreign ships in domestic waters "is unlikely to reflect congressional intent" because such an all-or-nothing approach could nullify other applications of the statute. Id. at 132, 139, 125 S.Ct. 2169. Instead, the Court explained that it is necessary to consider each disputed provisions separately to assess whether there is the potential for interference with the internal affairs of the foreign-flagged ship. Id. 132-33, 125 S.Ct. 2169.
Here, DAL seeks to convert the principle that patent laws do not apply to foreign activities into the categorical rule that U.S.-patent laws can never extend to U.S.-flagged ships in international water. DAL's argument fails to consider the possibility for extraterritorial applications or for applications involving the internal affairs of a U.S.-flagged ship. Case law shows that these possibilities are not so remote. For example, in Brown v. Duchesne , the Court held that U.S. patent laws did not apply to a French-flagged ship in the port of Boston. 60 U.S. (19 How.) 183, 198-99, 15 L.Ed. 595 (1856). The patented technology claimed an improvement in the construction of the gaff of sailing vessels, a gaff being an integral part of the ship. Id. at 188, 193. Because the gaff was part of the ship's construction and was attached to the ship in France, the Court held that U.S. patent laws would not apply to any potential infringement occurring in U.S. ports. Id. at 198-99. The holding in Duchesne suggests that whether an infringement dispute involves the internal affairs of a ship may depend on the patented technology itself. DAL's proposed categorical rule fails to account for such possibilities, possibilities that are as infinite as the sea.
Lastly, it is worth recognizing the Supreme Court's increasing interest in international activity that bears on U.S. patent laws, indicating that we should cautiously consider cases presenting extraterritoriality questions. In Impression Products Inc. v. Lexmark International, Inc. , the Court held that a patent owner's exclusive rights in its invention or improvement can be exhausted through its international sales and recognized that U.S. patent laws do not traditionally apply abroad. --- U.S. ----, 137 S.Ct. 1523, 1536, 198 L.Ed.2d 1 (2017). The Court concluded that a patent *1008 owner cannot assert infringement liability against a party importing its foreign-sold patented inventions into the United States. Id. The Court recently heard argument in WesternGeco LLC v. ION Geophysical Corp. , No. 16-1011 (S. Ct.), which presents the question of whether a patent owner, after proving a domestic act of infringement, can obtain damages for lost profits for failure to win service contracts to be performed on the high seas. While the location of damages is at issue in WesternGeco , and location of liability is at issue in the instant case, both grapple with the question of how to ensure that a U.S. patent owner can recover from the harm of infringement for patented technology that involves activity in international waters.
What is particularly troubling in this case is that if U.S. law does not apply to infringing activity on a U.S.-flagged ship in international water, then it is possible no law applies. DAL seeks to promote the exploitation of this loophole by instructing potential infringers to take to the high seas, modern day privateers armed with letters of marque from the U.S. government. That view is distinctly harmful where, as here, the patented invention operates exclusively on the high seas. With continuing advances in deep sea technology and the increasing accessibility of international waters, and the far reaches of outer space, we should consider the scope and protections of U.S. patent law without resorting to categorical rules.

The alleged infringement in this case occurred in the exclusive economic zone ("EEZ") of Brazil. The EEZ is " 'an area beyond and adjacent to the territorial sea' which 'shall not extend beyond 200 nautical miles from the baselines from which the breadth of the territorial sea is measured.' " Elizabeth I. Winston, Patent Boundaries , 87 Temp. L. Rev. 501, 508 (2015) (quoting the United Nations Convention on the Law of the Sea, Dec. 10, 1982, 1833 U.N.T.S. 397, 418-19 (arts. 55, 57) ). The United States has adopted the same definition of the exclusive economic zone in 1983 by Presidential Proclamation. Id . (citing Proclamation No. 5030, 48 Fed. Reg. 10,605 (Mar. 10, 1983) ). In the EEZ, a nation has minimal sovereign rights. For example, the United States "possesses sovereign rights in economic exploitation of natural resources and jurisdiction over marine scientific research." Patent Boundaries , 87 Temp. L. Rev. at 508.