Opinion issued June 7, 2007










 






In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00906-CV






RODGER PETERS, JR., Appellant


V.


NORWEGIAN CRUISE LINE LIMITED D/B/A NORWEGIAN CRUISE
LINE, Appellee






On Appeal from the 270th District Court

Harris County, Texas

Trial Court Cause No. 2000-39257-A







MEMORANDUM OPINION Appellant, Rodger Peters Jr., (1) appeals from a summary judgment in favor of
appellee, Norwegian Cruise Line Limited ("Norwegian"). Peters filed suit against
Norwegian, alleging causes of action for negligent misrepresentation, fraud,
fraudulent inducement, violations of the Deceptive Trade Practices-Consumer
Protection Act ("DTPA"), (2) breach of contract, unjust enrichment, and violations of
chapter 121 of the Human Resources Code ("Chapter 121") (3) in connection with
cruises that he took on two of Norwegian's ships. In his first two issues, Peters
contends that the trial court erred by granting summary judgment because
Norwegian's no-evidence motion did not adequately identify the challenged elements,
and he presented evidence that raised an issue of fact on those elements that were
properly challenged. In his remaining five issues, Peters asserts that he presented
evidence to raise an issue of fact on each of the elements in each of the claims
challenged in Norwegian's traditional summary judgment motion. We conclude that
the trial court improperly granted summary judgment on Peters's claims for negligent
misrepresentation, fraud, fraudulent inducement, DTPA, breach of contract and unjust
enrichment, as well as Peters's Chapter 121 claims based on Norwegian charging
Peters more for a room than non-mobility-impaired passengers. We further conclude
that the trial court properly granted summary judgment on Peters's Chapter 121
claims based on the accessibility of Norwegian's ships. We, therefore, affirm in part,
reverse in part and remand the cause.Background Due to an untreatable genetic condition, Peters required a wheelchair for
mobility. In 1998, Peters decided to take a cruise on Norwegian's ship Norwegian
Star ("the Star") after he saw a poster for a "Texaribbean Cruise" in the window of
a travel agency. On at least 15 different occasions, Peters spoke with a travel agent,
Camille Jones, regarding the accessibility of the Star for physically disabled people. 
Jones would try to get answers from Norwegian for Peters's specific questions and
then she would pass the information to Peters. Peters testified that Jones told him that
the elevators were "large enough for the wheelchairs to get in." According to Peters,
Jones informed him that "she was unsure" if the ship had public restrooms that could
accommodate his wheelchair, but that his bedroom would have a restroom that he
could use. Peters also asked about the accessibility of the ports of call and was told
"all three of them were accessible." Peters said that Jones specifically told him that
he would be able to go on a glass-bottom boat in Cozumel. Peters also read a
Norwegian brochure concerning the cruise that led him to believe that many of the
shore excursions were accessible. 

 Peters eventually purchased tickets for himself and three friends to take the
cruise on the Star. After he had purchased the tickets, Peters was notified by
Norwegian of certain requirements Norwegian had for disabled passengers. Peters
was notified he should travel in the same cabin with a non-mobility-impaired
companion who could "provide assistance in the unlikely event of an emergency."
Peters was also required to provide a letter from his doctor stating that he was "fit to
travel." Finally, Peters was required to sign a release, releasing Norwegian and its
medical staff of all liability.

 When Peters took the cruise on the Star, the ship was not fully able to
accommodate his wheelchair. Although Jones had told Peters that the elevators were
"large enough for the wheelchairs to get in," Peters could not get his wheelchair into
the only elevator that could access the tenth deck, which resulted in his inability to
dine at the restaurant on that deck or take part in any of the activities there, and he
had to turn his wheelchair sideways to get into two other elevators. Peters could not
access the public restroom facilities and had to go to his room to access a restroom,
but that was consistent with what Jones had told him. Peters also had other problems
with access on the Star. Peters could not get to the sick bay because the only elevator
to it had a six-inch step and was too small for his wheelchair. Additionally, the sauna
and swimming pool were inaccessible to Peters due to the lip around the sauna and
the absence of a lift for the pool. 

 The ports of call visited by the Star were not fully accessible to Peters, unlike
what Jones had told him. Although Jones had said all the ports of call were
accessible, Peters was unable to go ashore in Roatan, Honduras because the dock had
steps and the gangplank from the ship was too narrow for his wheelchair. Two men
offered to carry Peters and the wheelchair off the ship, but Peters did not feel safe
with them carrying him. Additionally, Peters was unable to take the glass-bottom
boat excursion in Cozumel, unlike what Jones had specifically told him. Peters
explained that he was unable to go on the glass-bottom boat because the bus that
served as the only transportation from the ship to the boat was not accessible to
people in wheelchairs. Although he acknowledged that he could have paid a different
bus driver to pick him up to take him to the boat, Peters said he learned that the size
of the boat made it inaccessible to wheelchairs. 

 Despite these problems, Peters decided to take another Texaribbean Cruise in
September 2000, this time on the Norwegian Sea ("the Sea"). Peters asked his new
travel agent about accessibility on the Sea and was informed that "a lot of the
accessibility issues had been taken care of." Despite this assurance, Peters had
accessibility problems on the Sea. His room was too small, and he could only access
it after employees of the ship removed some of the furniture from the room. The
dining table was too low for him, but he acknowledges that he did not ask for
assistance in having the table adjusted. One of the lounges had no seating for
wheelchairs and Peters had to sit apart from his friends, in an aisle, where he felt like
he was in the way and was bumped once by someone. Peters did not ask to be moved
from that location, however. Peters could not access the computers in the internet
café because the tables were too close together, but he was able to send an email from
the internet café with the assistance of an employee. Like on the Star, the public
restrooms on the Sea were not accessible to Peters. Also like on the Star, Peters
could not access the tenth deck due to the size of the elevator, which denied him
access to the restaurant there and a tour of the navigation bridge. Of the three ports
of call for the Sea, Peters was only able to go ashore in one of them, Cozumel. In
Cancun, he was not allowed on the tender that provided transport to the shore,
because, he was told, it was too dangerous to take his electric wheelchair aboard the
tender. Peters also did not go ashore in Roatan because the ramp was again too
narrow. 

 This suit was originally filed by three other plaintiffs in August 2000. In
September 2001, Peters and another plaintiff joined the suit when the plaintiffs filed
their Third Amended Petition. Norwegian filed a motion for summary judgment in
July 2005, requesting summary judgment on all claims asserted by all plaintiffs. Days
after Norwegian filed its motion for summary judgment, all the plaintiffs except
Peters nonsuited their claims against Norwegian. Peters filed a response to
Norwegian's motion and Norwegian filed a reply to that response. On August 16,
2005, the trial court signed an order granting Norwegian's motion for summary
judgment without stating the grounds upon which it relied. Because some of the
other plaintiffs still had unresolved claims pending against another defendant, the trial
court later severed Peters's claims against Norwegian, making the summary judgment
final and appealable.

Summary Judgment Standard of Review

 We review summary judgments de novo. Valence Operating Co. v. Dorsett,
164 S.W.3d 656, 661 (Tex. 2005). When, as here, a summary judgment does not
specify the grounds on which it was granted, we will affirm the judgment if any one
of the theories advanced in the motion is meritorious. Joe v. Two Thirty Nine Joint
Venture, 145 S.W.3d 150, 157 (Tex. 2004). However, a court errs by granting 
summary judgment on grounds that were not presented in the motion. Johnson v.
Brewer & Pritchard, P.C., 73 S.W.3d 193, 204 (Tex. 2002) (citing Sci. Spectrum, Inc.
v. Martinez, 941 S.W.2d 910, 912 (Tex. 1997)).

 Traditional summary judgment is proper only when the movant establishes that
there is no genuine issue of material fact and that the movant is entitled to judgment
as a matter of law. Tex. R. Civ. P. 166a(c). The motion must state the specific
grounds relied upon for summary judgment. Id. A defendant moving for traditional
summary judgment must conclusively negate at least one essential element of each
of the plaintiff's causes of action or conclusively establish each element of an
affirmative defense. Sci. Spectrum, Inc., 941 S.W.2d at 911. In reviewing a
traditional summary judgment, we must indulge every reasonable inference in favor
of the nonmovant, take all evidence favorable to the nonmovant as true, and resolve
any doubts in favor of the nonmovant. Valence Operating Co., 164 S.W.3d at 661. 

 In a no-evidence motion for summary judgment, after adequate time for
discovery, a party may move for summary judgment on the ground that there is no
evidence of one or more essential elements of a claim or defense on which the
opposing party has the burden of proof. Tex. R. Civ. P. 166a(i). The movant's no-evidence motion for summary judgment must specifically state the elements it
challenges on the grounds of no evidence. Id.; Malcomson Rd. Util. Dist. v. Newsom,
171 S.W.3d 257, 262 (Tex. App.--Houston [1st Dist.] 2005, pet. denied). The trial
court must grant the motion unless the nonmovant produces summary judgment
evidence raising a genuine issue of material fact. Tex. R. Civ. P. 166a(i). We review
a no-evidence summary judgment by construing the record in the light most favorable
to the nonmovant and disregarding all contrary evidence and inferences. Patriacca
v. Frost, 98 S.W.3d 303, 306 (Tex. App.--Houston [1st Dist.] 2003, no pet.). A trial
court improperly renders a no-evidence summary judgment if the nonmovant presents
more than a scintilla of probative evidence to raise a genuine issue of material fact. 
Greathouse v. Alvin Indep. Sch. Dist., 17 S.W.3d 419, 423 (Tex. App.--Houston [1st
Dist.] 2000, no pet.). More than a scintilla of evidence exists when the evidence
"would allow reasonable and fair-minded people to differ in their conclusions." 
Forbes Inc. v. Granada Biosciences, Inc., 124 S.W.3d 167, 172 (Tex. 2003). 

Negligent Misrepresentation, Fraud, and Fraudulent Inducement

 Norwegian filed a traditional and no-evidence motion for summary judgment
on Peters's claims for negligent misrepresentation, fraud, and fraudulent inducement. 
Peters challenges the trial court's grant of Norwegian's motions on these claims.

 A. No-Evidence Motion for Summary Judgment 

 In his first and second issues, Peters contends that the no-evidence motion for
summary judgment failed to properly identify the challenged elements and that he
presented evidence sufficient to raise a question of fact on those elements that were
challenged.


 1. Elements Challenged in the No-Evidence Motion

 The parties do not dispute that the only challenge asserted by Norwegian was
the "false representation" element of the negligent misrepresentation, fraud, and
fraudulent inducement claims. (4) The parties, however, dispute whether the no-evidence challenge that was limited to the element of "false representation," was
further limited to the sole event with the glass-bottom boat, as Peters contends, or
whether the challenge related to the entire element of "false representation," as
Norwegian asserts. Peters contends that because the motion for summary judgment
specifically mentioned the sole event of the glass-bottom boat, the no-evidence
motion challenged only the evidence pertaining to the claim that the glass-bottom
boat was not accessible, and not any other allegedly false representation. To support
his position, Peters cites to Hamlett, which states, "When it is not readily apparent to
the trial court that summary judgment is sought under rule 166a(i), the appellate court
will presume that the motion is filed under the traditional summary judgment rule and
analyze it accordingly." Hamlett v. Holcomb, 69 S.W.3d 816, 819 (Tex.
App.--Corpus Christi 2002, no pet.) However, after Hamlett, the Texas Supreme
Court stated, "We disapprove of decisions that hold or imply that, if a party attaches
evidence to a motion for summary judgment, any request for summary judgment
under Rule 166a(i) will be disregarded." Binur v. Jacobo, 135 S.W.3d 646, 651 (Tex.
2004). Rather, the Supreme Court of Texas held that "[i]f a motion clearly sets forth
its grounds and otherwise meets Rule 166a's requirements, it is sufficient." Id. 

 We conclude that the no-evidence motion concerning the element of "false
representation" was not limited to the event with the glass-bottom boat. See Tex. R.
Civ. P. 166a(i); Cmty. Initiatives, Inc. v Chase Bank of Tex., 153 S.W.3d 270, 279
(Tex. App.--El Paso 2004, no pet.) (stating that no-evidence movant need not attack
specific evidentiary components that make up element of claim). The parties do not
dispute that Norwegian's motion asserts there is no evidence of the false
representation element with respect to Peters's claims for negligent misrepresentation,
fraud, and fraudulent inducement. We hold that the element of false representation
was challenged in the no-evidence motion and that any evidence pertinent to that
element could be properly considered. We overrule Peters's first issue as it pertains
to the false representation element of his negligent misrepresentation, fraud, and
fraudulent inducement claims. 

 2. Evidence of "False Representation" Presented by Peters

 In his second issue, Peters asserts that the trial court erred by granting summary
judgment on his negligent misrepresentation, fraud, and fraudulent inducement claims
because he produced more than a scintilla of evidence on the element of "false
representation." On appeal, as in his response to Norwegian's no-evidence motion
for summary judgment, Peters contends that he presented evidence of Norwegian's
false representation that the Star was accessible to people using wheelchairs and that
all three ports of call "were accessible." Viewing the evidence in a light most
favorable to Peters, the evidence shows that Jones (5) told him that the Star was
accessible to him and his wheelchair. (6) Although Jones had informed Peters that all
of the ports were accessible, Peters was unable to go ashore in Roatan, because the
dock had steps and the gangplank from the ship was too narrow for his wheelchair. 
Norwegian responds that two men offered to carry Peters and the wheelchair off the
ship, and that it was physically possible for him to leave the ship at the port in
Roatan. We are required, however, to view the evidence in a light most favorable to
Peters, who testified that he did not feel it was safe for the men to carry him down the
narrow gangplank of the ship. We also note that Peters presented other evidence that
the only elevator able to access the tenth deck was too small for his wheelchair and
thus the restaurant and events on the tenth deck were inaccessible. In addition, Peters
could not access the sauna, pools, and sick bay. Viewing the evidence in a light most
favorable to Peters, the evidence shows that Jones, who was relaying information
given to her by Norwegian, made false statements concerning the accessibility of the
ship and ports.

 Peters produced some evidence that he was not able to go ashore in all the ports
and that the public restrooms, swimming pool, the entire tenth deck, as well as other
facilities, were not accessible. We conclude that the evidence "would allow
reasonable and fair-minded people to differ in their conclusions" regarding whether
Norwegian made false representations to Peters regarding the accessibility of the Star. 
See John v. Marshall Health Servs., Inc., 91 S.W.3d 446, 450 (Tex. App.--Texarkana
2002, pet. denied) (finding some evidence of false representation where plaintiff
testified that "he was given positive assurances about each of his concerns" and that
these assurances were false). Having determined that there is an issue of fact
concerning statements related to Peters about the Norwegian cruise, we do not reach
his other assertions that false statements were made to him about the glass-bottom
boat, the accessibility of the ports on his Sea cruise, and the accessibility of the Sea
as compared to the Star. Because Peters presented some evidence in response to the
no-evidence challenge on the element concerning false statement, we conclude that
the trial court erred by rendering the no-evidence motion for summary judgment in
favor of Norwegian. We sustain Peters's second issue as it relates to his negligent
misrepresentation, fraud, and fraudulent inducement claims.

B. Traditional Motion for Summary Judgment

 In his third and fourth issues, Peters contends that the trial court erred by
granting traditional summary judgment on his fraud, fraudulent inducement, and
negligent misrepresentation claims because Norwegian did not conclusively establish
that there is no genuine issue of material fact regarding one or more of the elements
of the claims. The only elements discussed by Norwegian in the motion for summary
judgment, other than the no-evidence point regarding false representations, are the
elements of reliance and injury, which are common to these causes of action.

 1. Reliance

 On appeal, as in its motion for summary judgment, Norwegian contends that
Peters did not rely on the statements about the cruises in making his decision to go
on the cruises. Norwegian points to Jones's deposition testimony that Peters received
the brochure with information on the glass-bottom boat excursion after he purchased
his tickets. However, Jones's testimony was that the brochure "might have been" in
the packet that Norwegian sent after the tickets were purchased. Jones's testimony
does not conclusively show that the brochure was not used by Peters in his decision
to take the cruise.

 Norwegian further contends that because Peters conceded that he would take
another cruise on either the Sea or the Star, he cannot show that he relied on the
statements about the cruises. However, Peters's statement--made after he had filed
suit for the cruises on the Sea and the Star--does not conclusively negate Peters's
reliance on past representations by Norwegian. Peters was concerned with
accessibility onboard the ships and his ability to go ashore. Before purchasing his
tickets, he repeatedly asked questions relating to those concerns. Only after he had
received answers assuring him of his ability to access the ships and go ashore did he
purchase tickets.

 Norwegian further asserts that Peters acknowledged that the travel agent never
made any assurances about transportation to the on-shore excursions and was warned
by Norwegian that he might need individual transportation. Although Norwegian
challenges the evidence relating to the on-shore excursions, it has not challenged the
other false statements that Peters contends were made when he purchased the tickets. 
Peters asserts that he specifically asked his travel agents regarding accessibility
before he purchased either cruise, which indicates that he was concerned about that
issue in making his decision to go on the cruises. Jones, one of Peters's travel agents,
testified that going to the ports was "part of what [Peters] was looking forward to,"
and that the ports and the shore excursions were also a vital part of purchasing the
cruise. Jones acknowledged that she understood that accessibility was of particular
concern to Peters. Peters also produced the deposition testimony of Ursula Schleider,
the Director of Marketing Communications for Norwegian. Schleider testified,
"When we market the product, we speak about what the ship is and where that ship
sails, I think that is--what encourages a person to purchase or not purchase the cruise
. . . is on the ship and where it sails to." She also testified that "it's the destination
that sells the cruise," and that "[g]oing ashore would be important." Arturo Guerrero,
the Vice-President of Hotel Operations for Norwegian, also testified that the ability
to visit the ports of call on a cruise was an important part of the decision to purchase
a ticket. 

 Viewing the evidence in a light most favorable to Peters, see Patriacca, 98
S.W.3d at 306, some evidence shows that Peters relied on the false representations
concerning the accessibility of the ships. We conclude that summary judgment on the
element of reliance was improper. See Forbes Inc., 124 S.W.3d at 172; Valence
Operating Co., 164 S.W.3d at 661.

 2. Injury

 Norwegian asserts in its motion for summary judgment that because Peters was
not "required to pay money for on shore excursions that [he] could not participate in,"
he suffered no economic injury. Although Norwegian correctly notes that Peters did
not pay for excursions he did not participate in, those damages are not claimed by
Peters. Peters claims damages for the purchase price of the tickets (7) and his lost
vacation time he used to take the cruises. In addition to the false statements about the
excursions, Peters also asserts that he was damaged by relying on other allegedly
false representations about the accessibility of the ships. Norwegian did not address
these other allegedly false representations in its motion for summary judgment. We
conclude that Norwegian did not conclusively negate the injury element of Peters's
claims. See Johnson, 73 S.W.3d at 204 (holding trial court could not have granted
summary judgment on grounds not raised). Because we conclude that Norwegian
failed to conclusively negate the elements of reliance and injury, summary judgment
was improper on Peters's claims for negligent misrepresentation, fraud, and
fraudulent inducement. See Martinez, 941 S.W.2d at 911. We sustain Peters's third
and fourth issues.

DTPA

 As part of his first issue, Peters contends that Norwegian's no-evidence motion
on his DTPA claims is limited to whether there is no evidence that Norwegian
engaged in false, misleading or deceptive acts. (8) Specifically, Norwegian moved for
no-evidence summary judgment on the grounds that there was "no evidence that
[Norwegian] made false representations about the cruises within the scope of
§ 17.46(b)(5) (9) and (b)(7)," (10) and that there was no evidence that Norwegian "intended
to induce disabled persons into buying tickets or that plaintiffs would not have taken
their cruises had additional detail been included" with respect to the section
17.46(b)(24) claim. (11) Norwegian agrees that these are the elements that it challenged
in its no-evidence motion for summary judgment. Because the parties agree that the
no-evidence motion only challenged these elements, we sustain Peters's first issue as
it relates to his DTPA claims.

 As part of his second issue, Peters contends that the trial court erred by
granting the no-evidence motion for summary judgment on his DTPA claims that rely
on the same representations alleged for his negligent misrepresentation, fraud, and
fraudulent inducement claims. As discussed above, Peters testified that he was told
that the Star and the ports that it visited were accessible, but he was not able to access
the entire ship or all the ports. Viewing Peters's testimony in a light most favorable
to Peters, we conclude that a fact issue exists as to whether Norwegian made
representations that fall within the scope of sections 17.46(b)(5) and (7). See John,
91 S.W.3d at 450.

 With respect to the failure to disclose under section 17.46(b)(24), Norwegian
points to its brochure that had a disclaimer about shore excursions and it asserts that
it did not provide "highly specific information about the on-shore excursions and the
accessibility of certain features on the ships." Although the brochure may have
included a disclaimer, Norwegian fails to address the other grounds for the DTPA
claim that are premised on the representations made by Jones concerning the
accessibility of the ships and the ports. Peters produced evidence that there was
limited accessibility of the facilities on board the Star, that he was unable to go
ashore in three of the ports that were visited on the two cruises, and that in deciding
to go on the cruises, he relied upon the information he received regarding
accessibility, particularly as conveyed to him by Jones. Viewing the evidence in a
light favorable to Peters, some evidence shows that Norwegian failed to fully disclose
information to Peters that was intended to induce Peters into purchasing tickets for
the cruises. See SAS & Assocs., Inc. v. Home Mktg. Servicing, Inc., 168 S.W.3d 296,
302 (Tex. App.--Dallas 2005, pet. denied) (finding some evidence of
misrepresentation by failure to disclose where defendant knew of problems with
premises but did not disclose problems). Thus, even if Norwegian is correct in its
assertion regarding the shore excursion brochure, summary judgment was not proper
on Peters's failure-to-disclose DTPA claim because Norwegian did not conclusively
negate this element of Peters's claim.

 We conclude that the trial court erred by rendering the no-evidence motion in
favor of Norwegian because Peters presented some evidence on the challenged
elements. We sustain this portion of Peters's second issue. Because the traditional
motion for summary judgment asserted by Peters also concerns the same
representations discussed above concerning the DTPA claims, we also sustain his
fifth issue that challenges the trial court's rendition of traditional summary judgment
on the DTPA claims. 

Breach of Contract Concerning Peters's first issue that challenges the no-evidence motion for
summary judgment for the breach of contract claim, on appeal the parties agree that
the only element challenged is the element of breach. We therefore sustain Peters's
first issue as it relates to his breach of contract claim.

 In his second issue, Peters contends that summary judgment was improper on
the element of breach of contract because he was not taken to the ports of call, as
promised in the contract. (12) Peters points to evidence that he was unable to go ashore
in Roatan on both cruises and in Cancun on his cruise on the Sea, in contravention
of what was promised in the contract. As proof that Norwegian was bound to take
him to various ports during his two cruises, Peters identifies the portion of paragraph
one of the contract that states, "All the terms and provisions of all sides of this
Contract . . . are a part of this Contract." Peters contends that this incorporated the
itinerary of the portion of the form describing the various ports and that Norwegian
therefore had promised to take him to those ports when it promised to provide
"transportation as specified herein." 

 In response to Peters's claim that Norwegian failed to take him to ports of call,
Norwegian points to paragraph 27 of the contract which provides, in part,

 Handicapped persons are advised that certain international safety
requirements and U.S. Coast Guard Regulations may cause difficulty for
mobility-impaired persons or persons with severely impaired sight
and/or hearing. . . . [Norwegian] reserves the right to refuse or deny
participation in any activities or programs either aboard the vessel or
onshore at any port of call, which are sponsored or promoted by
[Norwegian] to any passenger who has, in the sole judgment of
[Norwegian], past or present medical conditions that may present risks
in such activity and programs, including, but not limited to participation
in Dive-in, Sail-on and Water-Bike programs on or off the vessel.

 

Peters challenges the applicability of paragraph 27 by asserting that leaving the ship
is not a "risky" activity; it is a necessary activity because all people who enter a cruise
ship must at some point disembark. Peters also contends that the only reason that
leaving the ship may have been risky to Peters was due to Norwegian's "providing
inferior and unsafe ramps and tenders for disembarkation." 

 We conclude that the sentence in paragraph 27 that warns that mobility-impaired persons may have difficulty on the cruise is not pertinent to whether the
agreement was breached here because Peters is not complaining that something was
difficult, he is asserting that he was not provided a visit to the ports, as promised. We
also conclude that the agreement, which allows Norwegian "to refuse or deny
participation in any activities or programs" that in its "sole judgment . . . may present
risks in such activity and programs" does not conclusively establish that the
agreement was not breached by the failure to allow Peters to visit the ports of call.
Peters presented evidence that Norwegian represented to him that someone with his
limited mobility would have available the ship, ports, and shore excursions, and
therefore, there is an issue of fact whether in the sole judgment of Norwegian, 
disembarking at the ports was a risky activity that is not allowed for someone who is
mobility impaired. We conclude that Peters has produced some evidence that
Norwegian breached the contract by failing to give Peters access to the ports of call. 
See See SAS & Assocs., Inc., 168 S.W.3d at 302. Therefore, the no-evidence
summary judgment on the element of breach of contract was improper. (13) We sustain
Peters's second issue with respect to his breach of contract claim. Having held that
there is an issue of fact on the no-evidence motion for summary judgment on the
breach of contract claim, we also conclude that the trial court erred by granting the
traditional summary judgment that is premised on the same grounds. We therefore
sustain Peters's sixth issue concerning the breach of contract claim. 

Unjust Enrichment 

 In his sixth issue, Peters also challenges the trial court's traditional summary
judgment on his unjust enrichment claim. (14) Norwegian moved for summary judgment
on the unjust enrichment claim by asserting that Peters could not prevail on the unjust
enrichment claim because there was a contract between the parties. (15)
 Peters
responded in the trial court, as in this appeal, that he produced some evidence that the
contract was a contract of adhesion and was unconscionable, and, thus, his unjust
enrichment claim was a viable alternative to his breach of contract claim.

 An adhesion contract is a "standardized contract form for consumer goods and
services that are offered on a 'take it or leave it' basis without affording the consumer
a realistic opportunity to bargain and under such conditions that the consumer cannot
obtain the desired product or services except by acquiescing." In re Media Arts
Group, Inc., 116 S.W.3d 900, 911 n.19 (Tex. App.--Houston [14th Dist.] 2003, orig.
proceeding) (emphasis deleted) (quoting In re H.E. Butt Grocery Co., 17 S.W.3d 360,
371 n.8 (Tex. App.--Houston [14th Dist.] 2000, orig. proceeding)). An adhesion
contract may be void if it is also unconscionable. Id. at 910 (citing In re Oakwood
Mobile Homes, Inc., 987 S.W.2d 571, 574 (Tex. 1999) (orig. proceeding)). A
contract may be found unconscionable if it contains "not only one-sided terms, but
whether, given the parties' general commercial background and the commercial needs
of the particular trade or case, the terms are so one-sided that they are unconscionable
under the circumstances existing when the parties made the contract." Id. at 912. 

 About two days before the cruise was set to depart, and after Peters had paid
for the cruise in full, he was presented with a form contract that recited that it was
binding whether or not signed by Peters. The form contract said that "[t]he fare
includes only the transportation as specified herein, full board, ordinary ship's food." 
The remainder of the contract, paragraphs two through 28, serve to limit Norwegian's
liability or to impose further conditions and restrictions upon the passenger. For
example, paragraph 12 provides that in the event of the passenger's death, the
passenger's heirs or representatives are limited to a recovery of $5,000, even if
Norwegian is liable for the death. Paragraph two states that Norwegian

 reserves the right to cancel any scheduled call at any port for any reason
at its option at any time whether before, during or after sailing of the
vessel, without previous notice to the passenger, and without any
liability to the passenger, for any loss, damage or delay whatsoever,
however consequential.


Paragraph 25 allows Norwegian to "increase fares without prior notice," requiring the
passenger either to accept the increased fair or cancel without penalty, as long as that
is done one month before departure, which would have been impossible here since
Peters only received the agreement a few days before the ship departed. Paragraph
28 purports to limit all suits against Norwegian to Dade County Florida, although the
cruises taken by Peters did not depart from, return to, or have any other connection
to Florida. Viewing the evidence in a light most favorable to Peters, the nonmovant,
the evidence shows that Norwegian gave Peters a one-sided form contract that Peters
had no opportunity to negotiate mere days before his cruise began. We conclude that
there was a fact issue whether the contract was a contract of adhesion and
unconscionable and, therefore, unenforceable. See Carnival Cruise Lines, Inc. v.
Shute, 499 U.S. 585, 593, 111 S. Ct. 1522, 1527 (1991) ("Common sense dictates that
a ticket of this kind will be a form contract the terms of which are not subject to
negotiation, and that an individual purchasing the ticket will not have bargaining
parity with the cruise line."). Because Peters has produced evidence to show that
there was no enforceable contract between the parties, Norwegian was not entitled to
summary judgment on Peters's unjust enrichment claim. We sustain Peters's sixth
issue concerning the unjust enrichment claim.

Chapter 121 Peters's claims under Chapter 121 can be separated into two types. First,
Peters alleges that Norwegian violated Chapter 121 because it treated disabled
passengers differently than other passengers. Peters also contends that he was
discriminated against because Norwegian failed to comply with the Texas
Architectural Barriers Act (16) ("TABA") and the Texas Accessibility Standards (17)
("TAS"). 

 Chapter 121 prohibits discrimination against persons with disabilities. 
Specifically, section 121.003 provides: 

 (a) Persons with disabilities have the same right as the able-bodied
to the full use and enjoyment of any public facility in the state.


 (b) No common carrier, airplane, railroad train, motor bus, streetcar,
boat, or other public conveyance or mode of transportation
operating within the state may refuse to accept as a passenger a
person with a disability solely because of the person's disability,
nor may a person with a disability be required to pay an additional
fare because of his or her use of an assistance animal, wheelchair,
crutches, or other device used to assist a person with a disability
in travel.


 . . . .

 

 (d) The discrimination prohibited by this section includes a refusal to allow
a person with a disability to use or be admitted to any public facility, a
ruse or subterfuge calculated to prevent or discourage a person with a
disability from using or being admitted to a public facility . . .


Tex. Hum. Res. Code Ann. § 121.003 (Vernon 2001). 


A. No-Evidence Motion Pertaining to Whether Peters Was Charged More

 Peters's first issue asserts that Norwegian did not move for no-evidence
summary judgment on his Chapter 121 claims except for specified elements. 
Norwegian's motion for summary judgment states, "Plaintiffs Have No Evidence That
[Norwegian] Charged Them More Than Non-Disabled Passengers." We conclude
that Norwegian moved for summary judgment on the ground that there was no
evidence that Norwegian required Peters "to pay an additional fare because of his . . .
use of [a] wheelchair . . . ." Tex. Hum. Res. Code Ann. § 121.003(b) (Vernon 2001).
 We sustain Peters's first issue as it relates to his Chapter 121 claims. (18)

 As part of his second issue, Peter contends that Norwegian's no-evidence
summary judgment was not properly granted because he raised a fact issue regarding
his Chapter 121 claims. In support of his claim that he was charged more than a non-mobility-impaired passenger, Peters points to a brochure published by Norwegian
detailing its Carribean and Bermuda cruises that states, "The handicapped rooms are
slightly more expensive than other inside staterooms because they are considerably
larger, but less expensive than the least expensive outside stateroom (i.e, room with
a view)." Norwegian responds that the brochure plainly states that it does not charge
"any additional premiums to disabled passengers." 

 We conclude that Peters produced some evidence that he was charged more
than a non-mobility-impaired passenger, in violation of Chapter 121, which disallows
Norwegian from requiring Peters "to pay an additional fare because of his . . . use of
[a] wheelchair . . . ." Tex. Hum. Res. Code Ann. § 121.003(b). Viewing the
evidence in a light most favorable to Peters, the non movant, the evidence shows that
he needed a larger room to accommodate his wheelchair and that Norwegian charged
more for that room. See, e.g., Indep. Living Res. v. Or. Arena Corp., 982 F. Supp.
698, 717-18 (D. Or. 1997) (holding that although wheelchair seating takes more
space than conventional seating, operator of arena was prohibited from charging
"higher price commensurate with the additional space that is consumed."). (19) Under the policy of Chapter 121, like the ADA, disabled individuals are given
the right to full enjoyment of public facilities. (20) Peters's evidence that he was charged
more for his room that was larger only to accommodate his wheelchair is some
evidence that he was charged more due to his disability. See id. We sustain Peters's
second issue as it relates to his Chapter 121 claim under 121.003(b).

B. Traditional Motion Concerning Whether the Ship was Renovated

 In his seventh issue, Peters contends that the trial court erred by granting
summary judgment on his Chapter 121 claims because Norwegian was not entitled
to traditional summary judgment. Norwegian moved for summary judgment on
Peters's claims of accessibility on the Star and the Sea on the grounds that:

 (1) the two ships were built before January 1, 1992, and therefore the
TABA and TAS do not apply;


 (2) because the State has not promulgated any regulations governing
passenger cruise ships to implement the TABA, Norwegian could
not be in violation; and


 (3) the legislature "did not intend to require foreign-flagged ships
that pick up passengers at Texas ports (but do not travel within
Texas) to make physical alterations to their ships in order to
accommodate disabled individuals."


 The provisions of the TABA apply to "a privately funded building or facility
that is defined as a 'public accommodation' by Section 301, Americans with
Disabilities Act of 1990 (42 U.S.C. Section 12181), and it subsequent amendments,
and that is constructed, renovated, or modified on or after January 1, 1992." (21) Tex.
Gov't Code Ann. § 469.003(a)(4) (Vernon Supp. 2006). The TAS further stated that
they apply to buildings and facilities covered by the TABA "during the design,
construction, and alteration of such buildings." TAS Rule 1.1. An "alteration" is
defined as a change to a covered building or facility

 that affects or could affect the usability of the building or facility or part
thereof. Alterations include, but are not limited to, remodeling,
renovation, rehabilitation, reconstruction, historic restoration, changes
or rearrangement of the structural parts or elements, and changes in or
rearrangements in the plan configuration of walls and full-height
partitions. Normal maintenance, reroofing, painting or wallpapering, or
changes to mechanical and electrical systems are not alterations unless
they affect the usability of the building or facility.


Id. Rule 3.5.9.


 It is undisputed that the Sea and the Star were built before January 1, 1992. 
Therefore, the TABA and TAS do not apply unless they were "renovated" or
"modified," see Tex. Gov't Code Ann. § 469.003(a)(4), or "altered," see TAS Rule
1.1, after that date. Norwegian contends that although the ships did have some work
done to them, it was not the type of "alteration" or "modification" that would trigger
the applicability of TABA or TAS.

 Peters identifies the affidavit of Sven-Erik Eklund as some evidence that the
Sea was covered by the TABA and TAS. Eklund is a Director-Superintendent
Engineer for Norwegian. In his affidavit he avers,

 Between January 1, 1992 and September 1, 2000 the only significant
change or modification of the Norwegian Sea reflected in Norwegian
Cruise Line's records was the conversion of cabins 6001, 6201, 7001,
and 7201 from Deluxe Cabins into Owner's suites and the conversion
of cabins 8000, 8001, and 8200 from Deluxe Cabins in Superior Deluxe
suites. These remodeling efforts did not involve removal of any walls
or any significant structural changes but did involve major refurbishing
of those cabins. . . . Norwegian Cruise Line's records reveal no
structural changes were done on the Norwegian Star between January 1,
1992 and [the time it left Norwegian's fleet].


Peters also identified an excerpt from the affidavit of Norwegian's witness James
Dolan, a consultant specializing in shipping and maritime issues. Dolan stated, "I
reviewed the [Sea's] original plans and compared them to the current plans and did
not find any evidence of substantial conversion or change since the ship was built in
1988." Peters further relies on Bakke's deposition. Bakke testified, in response to
a question asking when one of Norwegian's ships "last renovated," that Norwegian's
ships "go to dry-dock two times every five years" and that both the Sea and the Star
were in dry-dock at least once each in the late 1990s. Finally, Peters identifies a press
release that states that, due to an onboard fire, the Sea underwent "a multi-million
dollar refurbishment project" in January 2000. 

 Peters contends that because Eklund stated that several cabins on the Sea had
been remodeled, this brings at least those cabins within the TABA and the TAS. See
TAS Rule 3.5.9 ("alteration" includes "remodeling"). Peters also contends that
Dolan's affidavit stating there was no "substantial conversion or change" to the Sea
implicitly recognizes some change. Peter asserts that Bakke's testimony regarding
ships being placed in dry-dock, in response to a question about "renovations,"
coupled with his testimony that both ships at issue have been in dry-dock since the
effective date of the TABA and the TAS is some additional evidence that the TABA
and TAS apply to the ships. See TAS Rule 3.5.9 ("alteration" includes "renovation"). 
Finally, Peters contends that Norwegian's press release regarding the Sea going in
dry-dock for a "multi-million dollar refurbishment project" is some evidence that the
TABA and TAS apply.

 Eklund's affidavit also describes the upgrades to only seven of the Sea's many
cabins as a "refurbishment." He also specifically stated that no walls were moved. 
Dolan's affidavit, even if construed as Peters contends, indicates only that some
"change" was made to the Sea. Bakke's response to a question about renovations
mentioned only regular dry-dock visits. In the same response, Bakke also went on
to mention changing "carpet and upholstery." The press release that Peters identified
also uses the word "refurbishment." The press release further describes the dry-dock
changes as a "facelift." In detailing the "many enhancements," the press release
identifies new window drapes, carpet, curtains, upholstery, bedspreads, bedskirts, and
throw pillows. 

 Under the TAS, the terms "renovation" and "remodeling" further define an
"alteration." Id. The terms "refurbishment," "facelift," and "enhancement" do not. 
Id. Further, a "change" may be an "alteration" if it is a change "of the structural parts
or elements" or "in the plan configuration of walls." Id. The TAS does not apply to
"[n]ormal maintenance, reroofing, painting or wallpapering." Id. Further "changes
to mechanical and electrical systems are not alterations unless they affect the usability
of the building or facility." Id. 

 The "changes" and "renovations" that Peters identifies do not affect the
usability of the ships or appear to be of the type covered by the TABA and TAS. No
walls were moved and there is no other evidence of structural changes that would
affect the usability or accessibility of the ships. Under this record, we cannot
conclude that Peters has raised a fact issue regarding whether the ships at issue were
"altered" after January 1, 1992, such that the TABA and TAS would apply. (22) We
overrule Peters's seventh issue.

Conclusion

 We affirm the judgment of the trial court regarding Peters's Chapter 121 claims
based on violations of the Texas Architectural Barriers Act and the Texas
Accessibility Standards. We reverse the trial court's judgment in all other respects
and remand this cause for further proceedings not inconsistent with this opinion.




 Elsa Alcala

 Justice


Panel consists of Justices Taft, Alcala, and Hanks.



1. Rodger Peters Jr. passed away in 2004. On motion by Peters's parents, the trial court
substituted them as plaintiffs as representatives of Peters's estate. On appeal, both
parties refer to Peters as the appellant, as will we. 
2. Tex. Bus. & Com. Code Ann. §§ 17.41-.63 (Vernon 2002 & Supp. 2006).
3. Tex. Hum. Res. Code Ann. §§ 121.001-.011 (Vernon 2001 & Supp. 2006).
4. The elements of fraud are (1) that a material representation was made; (2) the
representation was false; (3) when the representation was made, the speaker knew it
was false or made the representation recklessly, without any knowledge of the truth,
and as a positive assertion; (4) the speaker made the representation with the intent that
the other party act upon it; (5) the other party acted in reliance on the representation;
and (6) that party thereby suffered injury. In re FirstMerit Bank, 52 S.W.3d 749, 758
(Tex. 2001). To prevail on a fraudulent inducement claim, "the elements of fraud
must be established as they relate to an agreement between the parties." Haase v.
Glazner, 62 S.W.3d 795, 798-99 (Tex. 2001). The elements of negligent
misrepresentation are (1) the defendant made a representation in the course of its
business, or in a transaction in which it had a pecuniary interest; (2) the defendant
supplied false information for the guidance of others in their business; (3) the
defendant did not exercise reasonable care or competence in obtaining or
communicating the information; and (4) the plaintiff suffered pecuniary loss by
justifiably relying on the representation. Fondren Constr. Co. v. Briarcliff Hous. Dev.
Assocs., Inc., 196 S.W.3d 210, 218 (Tex. App.--Houston [1st Dist.] 2006, no pet.).
5. Although Norwegian did not make these alleged misrepresentations directly to Peters,
a party may be liable for a misrepresentation made indirectly to a third person "if the
person making the misrepresentation had intent or knowledge that it should be
exhibited or repeated to a third person and intended or had reason to expect the third
person would act or refrain from acting in reliance upon the misrepresentation." 
Burroughs v. APS Int'l, Ltd., 93 S.W.3d 155, 162 (Tex. App.--Houston [14th Dist.]
2002, pet. denied). 
6. In its brief, Norwegian also asserts that any statement made by Peters's travel agents
are inadmissible hearsay. Norwegian raised this objection before the trial court, but
did not obtain a ruling. See Blancett v. Lagniappe Ventures, Inc., 177 S.W.3d 584,
589 (Tex. App.--Houston [1st Dist.] 2005, no pet.) (noting that written ruling on
objection to summary judgment evidence needed to preserve error); Rogers v. Cont'l
Airlines, Inc., 41 S.W.3d 196, 200 (Tex. App.--Houston [14th Dist.] 2001, no pet.) 
(same).
7. Peters paid for his own tickets as well as tickets for his traveling companions,
including his attendant that assisted him because of his impaired mobility.
8. The elements of a DTPA claim are (1) the plaintiff is a consumer, a person who seeks
or acquires goods or services by purchase or lease, (2) the defendant engaged in false,
misleading, or deceptive acts, and (3) the acts constituted a producing cause of the
consumer's damages. Tex. Bus. & Com. Code Ann. §§ 17.45(4), 17.50(a) (Vernon
2002 & Supp. 2006); Gill v. Boyd Distribution Ctr., 64 S.W.3d 601, 604 (Tex.
App.--Texarkana 2001, pet. denied).
9. Under section 17.46(b)(5) of the DTPA, a deceptive trace practice is "representing
that goods or services have sponsorship, approval, characteristics, ingredients, uses,
benefits, or quantities which they do not have or that a person has a sponsorship,
approval, status, affiliation, or connection which he does not." Tex. Bus. & Com.
Code Ann. § 17.46(b)(5) (Vernon Supp. 2006).
10. Under section 17.46(b)(7) of the DTPA, a deceptive trade practice is "representing
that goods or services are of a particular standard, quality, or grade, or that goods are
of a particular style or model, if they are of another." Id. § 17.46(b)(7) (Vernon Supp.
2006).
11. Under section 17.47(b)(24) of the DTPA, a deceptive trade practice is "failing to
disclose information concerning goods or services which was known at the time of
the transaction if such failure to disclose such information was intended to induce the
consumer into a transaction into which the consumer would not have entered had the
information been disclosed." Id. § 17.46(b)(24) (Vernon Supp. 2006).
12. Norwegian does not challenge the existence of a contract. The purported contract
between the parties is the "Contract of Passage." Peters received the contract and his
tickets after he paid for his tickets, a few days before his cruise. The contract was part
of a form that included his reservation number and the itinerary for the cruise, such
as arrival and departure times from the various ports. The contract consists of 28
numbered paragraphs covering the bottom one-third of the front of the itinerary and
almost the entire rear. The first paragraph of the contract provides,


 This passenger ticket contract (hereafter "Contract") constitutes a
contract of passage between [Norwegian] and the passenger or
purchaser (whether or not signed by or on his behalf). All the terms
and provisions of all sides of this Contract, including all of the
following matter printed below, are a part of this Contract to which the
passenger and/or purchaser, both on his/her behalf and on behalf of any
other person or persons, including children, for whom this ticket is
purchased, acknowledge and agree to be bound thereby by accepting
this contract or transportation from [Norwegian]. The fare includes
only the transportation as specified herein, full board, ordinary ship's
food, but does not include spirits, wine, beer, sodas or mineral waters. 
This Contract shall be the entire agreement between the parties and
supersedes all representations or conditions contained in [Norwegian's]
advertisements, notices, brochures or other literature and all promises
and agreements made or claimed to have been made to or with the
passenger or anyone representing him by any party.
13. Peters also asserts that Norwegian breached the contract by not providing "full board"
because he could not access the restaurant on the tenth deck of either ship and his
assigned dinner table was too low. We need not reach whether the contract was
breached on this ground because we have determined that there is an issue whether
the contract was breached on the ground pertaining to the visits to the ports.
14. On appeal, the parties agree that Norwegian did not assert a no-evidence motion for
summary judgment on Peters's claims for unjust enrichment. We sustain Peters's first
issue that contends that Norwegian did not assert a no-evidence motion for summary
judgment for the unjust enrichment claim. 
15. An unjust enrichment claim requires a plaintiff to show that the defendant received
a benefit from the plaintiff through fraud, duress, or the taking of an undue advantage
and it would be unjust for the defendant to retain the benefit. See Heldenfels Bros.,
Inc. v. City of Corpus Christi, 832 S.W.2d 39, 41 (Tex. 1992). 

16. Tex. Gov't Code Ann. §§ 469.001-.208 (Vernon 2004 & Supp. 2006).
17. The Texas Accessibility Standards ("TAS") were adopted by the Texas Department
of Licensing and Regulation and compliance with TAS is mandated by the
Department's regulations. 16 Tex. Admin. Code §§ 68.10(29), 68.20 (2007). The
TAS are available on the Department's website. See Texas Department of Licensing
and Regulation, http://www.license.state.tx.us/ab/tas/tascomplete.pdf (last visited
June 1, 2007).
18. Peters asserted other challenges to the trial court;'s grant of Norwegian's no-evidence
motion on his Chapter 121 claims, identifying fact issues relating to the requirements
that he submit forms that other passengers were not required to submit and that he
travel with a non-disabled companion, but we need not reach those points because
we conclude that there is an issue of fact on whether he was charged an additional
fare due to his disability.

19. The court relied on the regulations enacted by the Department of Justice to implement
the ADA and a "Technical Assistance Manual" promulgated by the Department. See
28 C.F.R. § 36.301(c); Department of Justice, Americans with Disabilities Act Title
Three Technical Assistance Manual §§ III-4.1400, 4.4600 (1993 & Supp. 1994)
available at http://www.usdoj.gov/crt/ada/taman3.html and
http://www.usdoj.gov/crt/ada/taman3up.html (last visited June 1, 2007) .


 Section 36.301(c) of the Code of Federal Regulations provides:


 A public accommodation may not impose a surcharge on a particular
individual with a disability or any group of individuals with disabilities
to cover the costs of measures, such as the provision of auxiliary aids,
barrier removal, alternatives to barrier removal, and reasonable
modifications in policies, practices or procedures, that are required to
provide that individual or group with the nondiscriminatory treatment
required by the Act or this part.


 28 C.F.R. § 36.301(c) 


 The Department of Justice's ADA Title Three Technical Assistance Manual provides
guidance in interpreting and applying the ADA. Section III-14.4600, pertaining to
seating in assembly areas of public accommodations contains the following question-and-answer example:


 May a public accommodation charge a wheelchair user a higher fee to
compensate for the extra space required to accommodate a wheelchair
or for storing or retrieving a wheelchair? No. People with disabilities
may not be subjected to additional charges related to their use of a
wheelchair.


 Department of Justice, Americans with Disabilities Act Title Three Technical
Assistance Manual § III-4.4600 (1993 & Supp. 1994).
20. The policy of Chapter 121 is "to encourage and enable persons with disabilities to
participate fully in the social and economic life of the state, to achieve maximum
personal independence . . . and to otherwise fully enjoy and use all public facilities
available within the state." Tex. Hum. Res. Code Ann. § 121.001 (Vernon 2001). 
The ADA states that "the Nation's proper goals regarding individuals with disabilities
are to assure equality of opportunity, full participation, independent living, and
economic self-sufficiency for such individuals." 42 U.S.C.S. § 12101(a)(8)
(LexisNexis 2003).
21. Neither party disputes that a cruise ship is a public accommodation. See Spector v.
Norwegian Cruise Line Ltd., 545 U.S. 119, 129, 125 S. Ct. 2169, 2177 (2005) (stating
that cruise ships fall within definition of "public accommodation" of the Americans
with Disabilities Act of 1990, 42 U.S.C. § 12181 et seq.)
22. Because we conclude that summary judgment was proper on the ground that the ships
were not altered after January 1, 1992, we do not address Peters's claims that
summary judgment was improper on the grounds of a lack of regulations that
expressly govern cruise ships or the legislature's intent to affect foreign-flagged
vessels.